IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALICE CLAUSS,                   :

                               :

      Plaintiff,               :

                                 :

         v.                  :         CIVIL ACTION NO. 3:14-CV-00889

                                 :

GEISINGER HEALTH PLAN,        :         (JUDGE KOSIK)

                                 :

      Defendant.           :

## **MEMORANDUM**

Plaintiff filed the instant action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").  Plaintiff's complaint alleges that she is a participant in the Geisinger Quality Options, Inc., Health Plan (the "Health Plan") administered by Defendant, and that Defendant wrongly denied her benefits due to her under the terms of the Health Plan.  Presently before the Court is Defendant's Motion for Summary Judgment.  Although Plaintiff did not file a motion for summary judgment, in her brief, she requests judgment in her favor and against Defendant.  (Doc. 27, Pltf.'s Br., at 15).  Accordingly, we will treat the case as if cross-motions for summary judgment were filed.  Sexton v. Group Long Term Disability Plan for Employees of Inmar Enterprises, Inc., Civ. No. 04-2475, 2006 WL 559908, at *1 (M.D. Pa. March 7, 2016).

### **I. Background**

Plaintiff, Alice Clauss, was employed as an Assistant Art Director at The Paper Magic Group, Inc., ("Paper Magic") since 2010.  (Doc. 22, Def.'s SOF, at 1 and 2; Doc. 26, Pltf.'s Answer to SOF, at 1).  Until 2013, Paper Magic provided its employees with group medical

insurance coverage through Independence Blue Cross ("Blue Cross").  (Doc. 26, at 1).  However,

in September of 2013, Paper Magic contracted with Geisinger Quality Options, Inc., to provide

its employees with group medical insurance coverage.  (Doc. 22, at 2; Doc. 26, at 2).

Plaintiff was diagnosed with Myasthenia Gravis[1] ("MG") and Myasthenia Gravis with

exacerbation.  (Doc. 22, at 5; Doc. 26, at 5).  Her neurologist, Scott M. Friedenberg, M.D., had

submitted to her prior medical insurance provider, Blue Cross, a request for pre-approval of

biweekly intravenous immunoglobulin ("IVIG") treatments.  This treatment course was opined to

be necessary by Dr. Friedenberg and Dr. Joseph Shovlin, Plaintiff's optometrist, because without

IVIG treatment, the only other drug alternatives to treat Plaintiff's MG produced not only

undesired results, but would eventually cause Plaintiff to develop subretinal neovascularization,

resulting in her permanent loss of vision.  (Doc. 23, Def.'s Ex. A To Def.'s Memorandum, at 176

and 190).  Further, both Dr. Friedenberg and Dr. Shovlin provide that Plaintiff did well with the

IVIG therapy, which allowed them to decrease the drug Prednisone.  (Id. at 152).  Plaintiff's

physicians opine that if IVIG therapy is not approved, then Plaintiff would be forced to increase

her Prednisone to control her MG, which will result in the permanent loss of her vision.  (Id. at

152 and 176).

When Paper Magic switched its medical insurance provider from Blue Cross to

Defendant, Plaintiff's doctors again sought pre-approval for biweekly IVIG treatments.  (Doc. 22,

at 6 and 9; Doc. 26, at 6 and 9; Doc. 23, Def.'s Ex. A, at 129).  In response, Defendant authorized

---

[1]Myasthenia Gravis is defined as "An autoimmune disorder marked by muscular weakness and easy fatigability. Weakness increases with activity and decreases with rest. The muscles of the face and neck are usually most affected, and there may be impairment of the ability to control the eyelids, chew, swallow, and speak. Muscles of the extremities may also be affected." 4-m Attorneys' Dictionary of Medicine M-79253.

a single IVIG treatment pending consideration of Plaintiff's request for pre-approval of IVIG

treatments.  (Id).  To assist in determining whether IVIG was medically necessary in treating

Plaintiff, Defendant sought an independent medical review from AllMed Healthcare

Management ("AllMed").  (Doc. 22, at 10; Doc. 26, at 10).  The AllMed reviewer concluded that

for the Plaintiff, "[t]he continued use of IVIG is not medically necessary," and that IVIG is not

effective as maintenance therapy for patients with chronic MG.  (Doc. 22, at 11; Doc. 23, Ex. A,

at 135).  The AllMed reviewer further provided:

> [T]he documentation suggests that IVIG is being used as maintenance
> therapy for chronic myasthenia in this case. There is no evidence in the
> peer-reviewed medical literature that IVIG maintenance therapy for
> myasthenia gravis provides long-term benefit with regard to clinical
> outcomes.
>
> While IVIG has been shown to be effective in acute myasthenia gravis
> exacerbations, there is no evidence that the use of IVIG is superior to
> corticosteroids in the treatment of exacerbations. This member is not
> documented to be refractory to the use of corticosteroids, and IVIG has
> not been shown to be effective as maintenance therapy. Since there is no
> evidence of this member experiencing a medically acute myasthenia
> exacerbation, the ongoing use of IVIG is not medically necessary per the
> policy.

(Id).

Plaintiff discounts that the AllMed reviewer fully considered the notes of Plaintiff's office

visits or medical testing, because Plaintiff's neurologist, Dr. Freidenberg, reported that Plaintiff:

> "[H]as been undergoing treatment for Myasthenia Gravis since
> December of 2007";
>
> That "since that time, [Plaintiff] has failed [is refractory to] Cellcept,
> Cyclosporine, and Tacrolimus.  Cyclosporine results in renal
> dysfunction.  Cellcept did not produce desired results.  Tacrolimus
> caused extreme lethargy and mental clouding";

> That "chronic steroid use has resulted in Serous Retinopathy as noted by Joseph Shovlin, OD of Northeastern Eye Institute"; and
>
> Doctors Freidenberg and Shovlin "attempted tapering [Plaintiff's] IVIG in the past; however, have been unsuccessful as a flare of symptoms always recurs."

(Doc. 26, at 11; Doc. 23, Ex. A, at 176).

On September 20, 2013, Defendant notified Plaintiff that it denied her request for biweekly IVIG treatment, stating that:

> Upon review of the information received, there is no evidence in the peer-reviewed literature that IVIG maintenance therapy for the diagnosis of myasthenia gravis provides long term benefit with regard to clinical outcomes. Therefore, this request is denied.

(Doc. 22, at 12; Doc. 26, 12; Doc. 23, Def.'s Ex. A, at 139-140).  Plaintiff sought expedited review of this denial. (Id. at 13).  Defendant's Internal Review Committee considered the appeal on October 24, 2013, and determined that the denial of IVIG treatment for Plaintiff was proper, explaining:

> There is no evidence of acute myasthenic crisis. There is no evidence of postoperative or planned thymectomy. There is no documentation of failure or intolerance to three months of two standard treatments. The policy coverage criteria for IVIG for myasthenia gravis are not met.
>
> A 2008 Cochrane article identified six randomized controlled trials of IVIG for myasthenia gravis. The report concluded: "In chronic myasthenia gravis, there is insufficient evidence from randomized trials to determine whether IVIG is efficacious."
>
> Per the American Association of Neuromuscular & Electrodiagnostic medicine guidelines: "Insufficient data exist on the role of IVIG in the chronic management of myasthenia gravis."
>
> Myasthenic crisis is a life-threatening condition, which is defined as weakness from acquired myasthenia gravis that is severe enough to necessitate intubation or to delay extubation following surgery. There is no evidence that the patient is currently experiencing myasthenic crisis. IVIG can be considered for myasthenic crisis but its efficacy for

4

chronic myasthenia gravis is unproven.

The policy is consistent with the current medical literature. There are no clinical circumstances unique to this case which would support a policy override, and as such, the request is not medically necessary in accordance with generally accepted standards of medical practice.

(Doc. 22, at 14-16; Doc. 26, 14-17; Doc. 23, Def.'s Ex. A, at 173-174).  Thus, Plaintiff was sent

a denial letter dated October 25, 2013, providing the following reasons for its decision to uphold

the denial for Plaintiff's IVIG treatments:

The specific reasons for the decision:

The criteria for medically necessary and/or medical necessity was not met for coverage of Intravenous Immune Globulin (IVIG) Gammagard® and/or Privigen®.[2]

The scientific or clinical judgment for the decision:

The Committee recommended to uphold the denial based on lack of evidence in the peer-reviewed medical literature to support the use [of] IVIG as a maintenance therapy in chronic myasthenia gravis.

(Doc. 22, at 14-16; Doc. 26, 14-17; Doc. 23, Def.'s Ex. A, at 177-180).

Plaintiff's penultamate attempt at having the initial denial overturned was seeking an

external review of the Committee's decision via Defendant's external administrative review

process.  (Doc. 22, at 18; Doc. 26, 18; Doc. 23, Def.'s Ex. A, at 196-240).  The external review

was conducted by a physician employed by the Medical Review Institute of America, Inc. (Id).

This final review in Defendant's administrative review process again resulted in a determination

that the denial of IVIG treatment for Plaintiff should be upheld.  (Doc. 22, at 20; Doc. 26, 20;

---

[2] Gammagard® and Privigen® are specific intravenous immune globulin drug products. (Doc. 23, at 118).

Doc. 23, Def.'s Ex. A, at 320-326).  Finally, Plaintiff filed this current ERISA action to which

Defendant filed a Motion for Summary Judgment.  Both parties have briefed the motion, and it is

now ripe for disposition.

## II. Legal Standard

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(c).  An issue is "genuine" if there is sufficient evidence with which a

reasonable jury could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986); Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988) (citing Anderson, 477

U.S. at 248).  A factual dispute is "material" if it might affect the outcome of the case.

Anderson, 477 U.S. at 248.  In determining whether an issue of material fact exists, the court

must consider the evidence in the light most favorable to the non-moving party.  Skerski v. Time

Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001); White v. Westinghouse Elec, Co., 862 F.2d

56, 59 (3d Cir. 1988).

### B. Standard of Review

A court reviewing an administrator's decision under a benefit plan subject to ERISA will

apply a *de novo* standard of review "unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

Viera v. Life Ins. Co. of North America, 642 F.3d 407, 413 (3d Cir. 2011) (quoting Firestone

Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  "Whether a plan administrator's

exercise of power is mandatory or discretionary depends upon the terms of the plan." Id. (quoting Luby v. Teamsters Health, Welfare, & Pension Trust Funds, 944 F.2d 1176, 1180 (3d Cir. 1991). Where the administrator has such authority, a court reviews a decision regarding coverage under an arbitrary and capricious standard. Viera, 642 F.3d at 413. The Health Plan at issue in this suit provides that the plan administrator has the discretionary authority to make benefit and eligibility determinations, and thus, the proper standard of review is whether Defendant's decision was arbitrary and capricious. (Doc. 23, Def.'s Ex. A, at 79); Metro Life Ins. Co. v. Glenn, 544 U.S. 105, 111 (2008)).

Under the arbitrary and capricious standard, a District Court may overturn an administrator's decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011) (quoting Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993). A decision regarding eligibility for benefits is not arbitrary and capricious if the decision "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Balmert v. Reliance Standard Life Ins. Co., 601 F.3d 497, 501 (6th Cir. 2010). "An arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence." Dowden v. Blue Cross & Blue Shield of Texas, Inc., 126 F.3d 641, 644 (5th Cir. 1997) (quoting Bellaire Gen. Hospital v. Blue Cross Blue Shield, 97 F.3d 822, 828 (5th Cir. 1996)). In applying the arbitrary and capricious standard in ERISA actions, a court is limited to reviewing the evidence contained within the administrative record. Abnathya, 2 F.3d at 45, n8.

An arbitrary and capricious standard should be utilized even when a conflict of interest

exists.  Metro Life Ins. Co. v. Glenn, 554 U.S. 105 (2008).  The Supreme Court has held that a

conflict of interest exists for ERISA purposes where the plan administrator evaluates and pays

benefit claims, even where the administrator is an insurance company and not the beneficiary's

employer.  Id. at 111.  In determining whether the decision to deny benefits was arbitrary and

capricious, Courts will weigh, as a factor, a potential conflict of interest.  Id. At 117; Firestone,

489 U.S. at 115.

### III. Analysis

In support of its motion for summary judgment, Defendant asserts that its decision to

deny Plaintiff IVIG treatments was not arbitrary and capricious because it was supported by

substantial evidence and Defendant's pre-published clinical policy.  Plaintiff argues that the

decision to deny Plaintiff IVIG treatments was arbitrary and capricious because Plaintiff does fit

within the contours of Defendant's Health Plan.

As a preliminary matter, the Court finds the existence of a conflict of interest, given

Defendant's plan administrator holds the dual role of decision maker and payer of benefits.  As

such, the Court will weigh this conflict as a factor against Defendant when determining whether

Defendant's decision to deny Plaintiff IVIG treatment was arbitrary and capricious.  See Glenn,

554 U.S. at 117.

### A. Reliance on Medical Evidence and Health Plan's Pre-Published Policy

In support of its motion for summary judgment, Defendant argues that its decision cannot

be construed as arbitrary and capricious given its reasoned reliance on "substantial medical

evidence" and the Health Plan's pre-published policy regarding whether IVIG treatment for

myasthenia gravis is considered "medically necessary" per the plan.  Specifically, Defendant

points to section 1.40(a-e) of the Health Plan, which provides that "medical necessity" or

"medically necessary" means:

> Covered Services rendered by Health Care Provider that the PPO determines are:
>
> > a) appropriate for the symptoms and diagnosis and treatment of the Member's condition...;
> >
> > b) provided for the diagnosis, and the direct care and treatment of the Member's condition...;
> >
> > c) in accordance with the current standards of good medical treatment practice by the general medical community;
> >
> > d) not primarily for the convenience of the Member, or the Member's Health Care Provider; and
> >
> > e) the most appropriate source or level of service that can safely be provided to the Member....

(Doc. 23, Ex. A., at 18).

Next, Defendant provides that for members suffering from MG, the Health Plan states that

IVIG will be considered "medically necessary" when the "following indications when specified

criteria are met:

> Medical documentation of one of the following indications:
>
> 1. Diagnosis of acute myasthenic crisis with decompensation; or
> 2. Use during postoperative period following a thymectomy; or
> 3. Use prior to planned thymectomy; and
>    • Documentation of therapeutic failure on, intolerance to, or contraindiction to at least two standard treatments (e.g. cholinesterase inhibitors, azathioprine, corticosteroids) and/or a combination of these treatments for a minimum of 3 months
> 4. Must be prescribed by a neurologist

(Id. at 120).  Finally, Defendant points out that the Health Plan policy provides that "[f]or chronic

forms of Myasthenia Gravis, treatment with IVIG is considered investigational and is not covered." (Id).  Defendant opines that this policy is based on more than "two dozen clinical studies and/or articles in peer-reviewed medical journals." (Doc. 21, Def.'s Br., at 4).  Therefore, Defendant suggests that the plain language of this plan and its pre-published policies, excludes the IVIG treatment Plaintiff seeks.  Moreover, Defendant argues that the independent medical reviewers all concluded that there is a lack of evidence in peer-reviewed medical literature concerning the efficacy of IVIG treatment for the maintenance of MG and thus, is not considered medically necessary. (Id. at 18).

Combating Defendant's arguments, Plaintiff asserts that the decision to deny her biweekly IVIG treatments was arbitrary and capricious because such treatments are medically necessary.  Moreover, Plaintiff advances that due to the exacerbations of her MG, she is in serious jeopardy of "serious impairment to bodily functions," and therefore satisfying the conditions under the Emergency Services section of the Health Plan. (Doc. 27, Pltf.'s Br., at 8).  We address each argument and counter-argument in turn.

**i. Medically Necessary**

First, the Court notes that in support of Defendant's Health Plan's policy that IVIG is not medically necessary in the maintenance treatment of MG, Defendant alleges that it refers to "two dozen clinical studies and/or articles in peer-reviewed medical journals" to support its policy that IVIG is investigational and/or experimental based on the absence of data on the efficacy of IVIG as a maintenance treatment for MG. (Doc. 21. Def.'s Br., at 4; Doc. 23, Ex. A., at 122-125).  However, less than a dozen of these articles actually deal with Myasthenia Gravis and IVIG, and even a smaller portion of those that actually reference Myasthenia Gravis have been revised or

published in the past four years.  To be sure, only one reference used by Defendant to form its

current policy on IVIG treatment of MG is shown to be published in the past four years, and the

source recommends that IVIG is "probably effective and should be considered for treating

moderate to severe myasthenia gravis...." Patwa H.S. et. al. *Evidence-based guideline:*

*Intravenous immunoglobulin in the treatment of neuromuscular disorders: Report of the*

*Therapeutics and Technology Assessment Subcommittee of the American Academy of Neurology*,

Neurology, 2012; 78; 1009.[3]

The questionable global policy combined with Plaintiff's two treating physician's

poignant opinions as to the efficacy of the IVIG treatments for Plaintiff, is also a factor that gives

us pause when determining whether Defendant's decision was arbitrary and capricious.

Specifically, Plaintiff's treating optometrist, Dr. Joseph Shovlin, and neurologist, Dr.

Freidenberg, have opined that Plaintiff is refractory to Cellcept, Cyclosporine, and Tacrolimus -

standard treatments for MG.  Without IVIG therapy, Plaintiff's physician's will be forced to

increase her Prednisone, which will cause Plaintiff to develop subretinal neovasularization which

"will result in permanent loss of vision."  (Doc. 23, Ex. A, at 152, 176, 182, 190).  It is for this

reason that Plaintiff's physicians opine that it is "absolutely essential that she have this type of

therapy."  (Id. at 182).  Moreover, they provide that IVIG treatments for Plaintiff "would not be

considered experimental since she has had a fantastic response with the last infusions."  (Id).

---

[3] In fact, one reference cited by Defendant to support its IVIG treatment of MG, Intravenous
Immunoglobulin: Prevention and Treatment of Disease. NIH Consensus Statement Online 1990 May 21-23;8(5):1-
23, provides the following disclaimer:

> This statement is more than five years old and is provided solely for historical purposes. Due
> to the cumulative nature of medical research, new knowledge has inevitably accumulated in
> this subject area in the time since the statement was initially prepared. Thus some of the
> material is likely to be out of date, and at worst simply wrong....

Despite the proven efficacy of IVIG treatments for Plaintiff, Defendant's independent reviewers concluded at each step of the administrative appeals process that IVIG treatments were not medically necessary for Plaintiff.  (Doc. 23, Ex. A., at 135, 140, 168).  All three reviewers cite to the lack of evidence in peer-reviewed medical literature on the efficacy of IVIG as maintenance therapy for MG.  (Id).  Additionally, the physicians providing the independent reviews further reasoned that Plaintiff's IVIG treatment should be denied since "there is no evidence that the use of IVIG is superior to corticosteroids in the treatment of exacerbations [and] [Plaintiff] is not documented refractory to the use of corticosteroids...." (Id. at 135).  The final reviewer of the administrative appeals process provided "[t]he policy is consistent with the current medical literature. There are no clinical circumstances unique to this case which would support a policy override, and as such, the request is not medically necessary...."  (Id. at 168).

In the context of ERISA cases, the Supreme Court has held that "plan administrators are not obliged to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003).  "Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another ... the plan administrator's decision cannot be said to have been arbitrary and capricious." McDonald v. Wester-Southern Life Ins. Co., 347 F.3d 161, 169 (6th Cir. 2003).  "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker, 538 U.S. at 834.

While Defendant was free to consider and rely upon the opinions of the nonexamining, independent reviewing medical consultants, it was not free to disregard Dr. Joseph Shovlin and Dr. Freidenberg's opinions without a reasoned explanation.  Therefore, in deciding whether

Defendant acted arbitrarily and capriciously in crediting the opinions of the reviewing medical consultants over the opinions of Plaintiff's treating physicians, the Court will look to the consideration Defendant afforded the contrasting medical opinions.

Upon reviewing the reports and opinions in the record, including the appeals decisions issued by Defendant on September 20, 2013, October 25, 2013, and April 8, 2014, the Court finds that Defendant did not offer a reasoned explanation for its decision to reject the opinions by Doctors Shovlin and Freidenberg. To the contrary, the independent reviewing medical consultants' opinions appear to contradict and ignore Plaintiff's medical record. Specifically, Dr. Freidenberg provided the following summary about Plaintiff's medical condition and treatment:

> Ms. Claus has failed multiple oral medications or experienced unacceptable side effects, has had incomplete response to plasmapheresis, but had a sustained response to IVIG with recurrence of symptoms after discontinuance of IVIG. IVIG allowed her to continue working as a graphic designer, to drive, and maintain quality of life.
>
> 1) Ms. Clauss has failed to obtain results from high doses of Prednisone in conjunction with other medications. Please see clinic encounter from July 30, 2012 where she was utilizing 40 mg/d of Prednisone, Cyclosporine 200 mg twice a day, and Cellcept 1500 mg twice a day. Despite this dosing, she experienced an exacerbation and required IVIG to treat her symptoms. She has undergone plasmapheresis multiple times with inadequate response requiring IVIG to obtain good recovery. Clinic notes from June 16, 2010 illustrate incomplete benefit from prolonged plasmapheresis at 1-2 week intervals. A subsequent transition to IVIG was effective. Most recently, we are using plasmapheresis with incomplete benefit.
>
> 2) Ms. Clauss has developed central serous retinopathy as documented by her ophthalmologist, which has improved on lower doses of steroids. Recent higher doses of Prednisone have resulted in a visual field loss due to retinal disease. She is currently having her dose of steroids lowered.
>
> 3) Ms. Clauss has failed high doses of multiple immunosuppressants including Cellcept (see above), Cyclosporine (causing renal insufficiency), and Tacrolimus (...causing cognitive impairment and worse fatigue).

> 4)  Multiple attempts in the past to discontinue or taper the duration of time
> between doses of IVIG has resulted in a recurrence of the patient's
> symptoms. Attempts to return to higher doses of Prednisone with other
> agents have been ineffective in providing adequate improvement and as
> noted above are producing an irreversible retinopathy.
> In summary, it appears that Ms. Clauss is refractory to high doses of steroids
> and has suffered long term complications from the use of steroids.

(Doc. 23, Ex. A, 207, 208).  It is further noted that the Defendants did not request an independent

medical examination of Plaintiff.

Despite Plaintiff's physicians documenting that she was refractory to steroids and that the

continued use of such doses will eventually cause Plaintiff to develop subretinal

neovascularization, resulting in the permanent loss of her vision, the independent reviewers failed

to acknowledge or refute these serious issues.  Rather, the reviewers made the following

conclusions: 1) "[t]here is no documentation of failure or intolerance to three months of two

standard treatments" (Doc. 23, Ex. A., 173-174); 2) "[t]his member is not documented to be

refractory to the use of corticosteroids, and IVIG has not been shown to be effective as

maintenance therapy" (Id. at 135); 3) "[t]he policy is consistent with the current medical

literature. There are no clinical circumstances unique to this case which would support a policy

override...." (Id. at 173).

The medical record quite clearly refutes the independent medical reviewers' above

conclusions.  Plaintiff has been documented to be refractory to the use of corticosteroids; Plaintiff

has been documented to have failed or have an intolerance to three months of two standard

treatments; and IVIG has, in fact, been shown to be effective as a maintenance therapy for this

Plaintiff.  Even more, this case does presents a unique situation: the use of the typical

maintenance drugs, if continued to be used at the current high dosages by Plaintiff, will result in

permanent loss of vision.  The marked lack of consideration or explanation, let alone any reasoned explanation, in the independent reviewer's opinions about this apparent conflict weighs heavily in favor of finding that Defendant acted unreasonably in crediting the independent reviewer's opinions over that of Doctors Shovlin and Freidenberg.  See Black & Decker, 538 U.S. at 834 ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician").

Finally, the Court considers whether the independent reviewer's opinions should be discounted since they were retained by Defendant to provide the independent reviews.  While these independent reviewers are not employees of Defendant, the Supreme Court has "acknowledged that physicians repeatedly retained by benefits plans may have an incentive to make a finding of not disabled in order to save their employers' money and preserve their own consulting arrangements."  Black & Decker, 538 U.S. at 832.  Although Plaintiff provides no concrete evidence that the independent reviewers' conclusions were altered due to a financial incentive, the independent reviewers' apparent financial interest raise some question regarding their opinions and is a factor to be weighed by the Court.

While review under the arbitrary and capricious standard is extremely deferential, it is not without "some teeth" and does not mean "no review."  McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003).  In determining whether Defendant acted arbitrarily and capriciously in making ERISA benefits determinations, this Court's review will include some review of the "quality and quantity of the medical evidence and the opinion on both sides of the issues."  Id.

As a whole, the Court finds that Defendant has not offered a reasoned explanation, based

15

upon the evidence in this particular case, that IVIG treatment is not medically necessary for this Plaintiff.  Rather, Defendant ignores the best evidence directly before it - the effectiveness of IVIG maintenance therapy for Plaintiff's MG - to cite to the absence of medical literature that supports the use of IVIG as maintenance therapy for MG.[4]  Moreover, Defendant's decision cannot be "well-reasoned" and "well-supported" when it relies on inaccurate and incorrect conclusory statements by its independent reviewers.  Specifically: that Plaintiff is not refractory to the use of corticosteroids when both of her treating physicians opine that she is and that the continued use of the same will result in permanent loss of vision; and that IVIG has not been shown to be effective as maintenance therapy when it is the only effective form of treatment for Plaintiff in her unique situation.  Quite clearly, Defendant had no intention to base its denial of coverage on Plaintiff's specific suitability for IVIG treatment.  Rather, Defendant made a strategic decision to deny coverage for IVIG treatment on the basis of a global policy that disregards the medical circumstances of individual patients. Thus, the Court finds that Defendant's denial of IVIG treatments for Plaintiff was arbitrary and capricious.

**ii. Emergency Service Provision**

Plaintiff also advances an argument that she qualifies for IVIG treatment under the Emergency Service provision of the Health Plan due to the exacerbations of her MG which manifest as acute symptoms putting her in serious jeopardy of causing "serious impairment of bodily functions." (Doc. 27, Pltf.'s Br., at 8).  Under the Health Plan, Emergency Services "do not

---

[4] The Court notes that more up-to-date medical literature, available at the time of the administrative review of Plaintiff's case, but not used as a reference in Defendant's Health Plan, provides that IVIG treatment is effective in the maintenance of MG.  Wegner B, Ahmed I., <u>Intravenous immunoglobulin monotherapy in long-term treatment of myasthenia gravis</u>. Clin Neurol Neurosurg. 2002 Dec; 105(1):3-8.

require precertification by the PPO.  Coverage for Emergency Services provided during the period

of the emergency shall include evaluation, testing, and if necessary, stabilization of the condition

of the Member...."  (Doc. 23, Def.'s Ex. A, at 30). Emergency Service is defined by the Health

Plan to include:

> Any health care service provided to a Member after the sudden onset of a
> medical condition that manifests itself by acute symptoms, of sufficient
> severity or severe pain, such that a prudent lay person, who possesses an
> average knowledge of health and medicine, could reasonably expect the
> absence of immediate medical attention to result in:
>
> a) placing the health of the Member ... in serious jeopardy;
> b) serious impairment to bodily functions; or
> c) serious dysfunction of any bodily organ or part.

(Id. at 14).

Defendant counters that Plaintiff's condition is chronic in nature and therefore cannot be

described as sudden or as an emergency and even if it did, any subsequent "bi-weekly IVIG

treatments would not qualify because 'follow-up services after the initial response to an

emergency are not Emergency Services.' " (Doc. 21, Def.'s Br., at 7; Doc. 23, Def.'s Ex. A., at

30).

We do not find Plaintiff's reading of the Health Plan to be so "patently incorrect and

unsupportable" as Defendant claims.  Moreover, we do not agree that an individual suffering

from a chronic disease cannot present with acute or sudden symptoms.  To be sure, Plaintiff's

treating physicians provide that when Plaintiff's IVIG treatments were tapered in the past, a "flare

[exacerbation] of symptoms always recurs."  (Doc. 23, Def.'s Ex. A., at 182).  Even more, there is

little doubt that given the Plaintiff's unique situation in that she is refractory to, and has adverse

side effects with, the commonly used maintenance drugs for MG, her health is in serious

jeopardy.  In fact, if Plaintiff is not afforded the IVIG treatments, then with time, she will develop

subretinal neovasularization, resulting in permanent loss of vision.  Certainly, permanent loss of

vision would be a "serious impairment to bodily functions" or a "serious dysfunction of [a] bodily

organ or part."  Again, for these reasons and the reasons set forth above, the Court finds that

Defendant's denial of IVIG treatments for Plaintiff, was arbitrary and capricious.

## B. Attorney's Fees

Plaintiff also seeks an award of attorneys' fees.  Under 29 U.S.C. § 1132(g)(1), the Court

may, "in its discretion ... allow a reasonable attorney's fee and costs of action to either party."  29

U.S.C. § 1132(g)(1).  In order to do so, a claimant must achieve "some degree of success on the

merits."  Hardt v. Reliance Stand Life Ins. Co., 560 U.S. 242 (2010).  The degree of success on

the merits standard requires more than "trivial success on the merits" or a "purely procedural

victory."  Id. at 255.  A three-step process is employed by the courts when assessing the merits of

an application for attorneys' fees.  Christian v. Honeywell Retirement Ben. Plan, Civ. No. 13-

4144, 2014 WL 1652222, at *2 (E.D. Pa. April 24, 2014) (citing Viera v. Life Ins. Co. of North

American, Civ. No. 09-3574, 2013 WL 3199091, at *2 (E.D. Pa. June 25, 2013).  The first step is

to determine whether the claimant is a "prevailing party," Hardt, 560 U.S. at 249; if that threshold

determination is made, the second step is to determine whether an award of attorneys' fees is

appropriate by examining five specific factors, known as the "Ursic Factors", id.; Ursic v.

Bethlehem Mines, 719 F.2d 670, 673 (3d Cir. 1983); and finally, if the Ursic factors suggest that

awarding attorneys' fees is appropriate, then a court should "review the attorney's fees and costs

requested and limit them to a reasonable amount."  Viera, Civ. No. 09-3574,  2013 WL 3199091,

at *2 (citing Hardt, 560 U.S. at 249).

As this Court has denied Defendant's motion for summary judgment in favor of Plaintiff,

Plaintiff is the prevailing party, and therefore the first step of the three step process is satisfied.

We next examine and weigh the Ursic factors, which include: 1) the offending parties' culpability

or bad faith; 2) the ability of the offending parties to satisfy the award of attorneys' fees; 3) the

deterrent effect of an award of attorneys' fees against the offending party; 4) the benefit conferred

upon members of the plan as a whole; and 5) the relative merits of the parties' position.  In re

Unisys Corp. Retiree Med. Beneftis ERISA Litig., 579 F.3d 220, 239 (3d Cir. 2009) (citing Ursic,

719 F.2d at 673).

On the first factor, the Court finds that Defendant acted with bad faith and culpability.  "A

losing party may be culpable, however, without having acted with an ulterior motive."

McPherson v. Employees' Pension Plan of Am. Re-Ins. Co., 33 F.3d 253, 256 (3d Cir. 1994).

Arbitrary or capricious denials of ERISA benefits may qualify as culpable conduct.  Haisley v.

Sedgwick Claims Management Services, Inc., Civ. No. 08-1463, 2011 WL 4565494, at *4 (W.D.

Pa. Sept. 29, 2011) (citing Musical v. Prudential Ins. Co. of Am., Civ. No. 05-1223, 2007 WL

3085606, at *2 (M.D. Pa. Oct. 19, 2007) ("courts have found illogical, arbitrary, or capricious

denials of ERISA benefits to be culpable").

Here, Defendant rejected the opinions of two of Plaintiff's treating health-care providers

and instead, relied on nonexamining medical consultants that merely performed a file review of

Plaintiff's medical records.  In those reviews, the nonexamining medical consultants provided

inconsistent and contradictory statements to that of Plaintiff's treating physicians, specifically,

that Plaintiff was not refractory to MG maintenance drugs when the treating physicians clearly

indicated that she is, thus, the urgent need for IVIG treatment.  Additionally, the overwhelming

basis for Defendant's denial of benefits was its reliance on the general absence of literature in the medical field on the efficacy of IVIG as a maintenance treatment for MG.  However, the unique circumstances in this case (Plaintiff being refractory to and suffering from adverse side effects from the other maintenance drugs, and the impending loss of vision should she continue with the high dosages of steroids), and the clear and undeniable fact that IVIG treatment was effective for Plaintiff, demonstrate the efficacy of IVIG treatment for this Plaintiff.  Therefore, the Court finds that Defendant's conduct demonstrates some degree of culpability, and that the first Ursic factor weighs in favor of an award of attorneys' fees.

As to the second factor - the opposing party's ability to satisfy an award of attorneys' fees - this factor also weighs in favor of an award as Defendant is a large insurance corporation.  See Moon v. Unum Provident Corp., 461 F.3d 639, 644 (6th Cir. 2006).

The third factor is the deterrent effect of an award of attorneys' fees against the offending party.  This factor weighs in favor of awarding attorneys fees since we found the denial of benefits to be arbitrary and capricious.  The award of attorneys' fees serves to deter similar future arbitrary and capricious denials of benefits, which will further the objectives of ERISA. McPherson, 33 F.3d at 258.

The fourth factor to consider is the benefit conferred upon members of the plan as a whole.  Where an award would only indirectly confer a benefit upon the plan members, it does not merit granting additional weight under the fourth factor.  Haisley, Civ. No. 08-1463, 2011 WL 4565494, at *6.  Therefore, the fourth factor is neutral and does not weigh in favor of a fee award.

Finally, the fifth factor - the relative merits of the parties' position - weighs slightly in favor of awarding Plaintiff attorneys' fees since the Court previously ruled that Defendant's

decision to deny benefits was arbitrary and capricious.  <u>Id</u>. at *7.

Weighing of the factors enumerated above entitles Plaintiff to an award of attorneys' fees. The Plaintiff may make an application for fees to this Court.

## IV. Conclusion

For the foregoing reasons, we will deny Defendant's motion for summary judgment and grant summary judgment in favor of the Plaintiff.  An appropriate order follows.